J. T. Healy & Son, Inc. *vs.* James A. Murphy & Son,
Inc. & others
(and two companion cases [1]).

Bristol.    April 8, 1970. — June 19, 1970.

Present: Wilkins, C.J., Spalding, Cutter, Reardon, & Quirico, JJ.

*Trade Secret. Agency,* Agent's duty of fidelity. *Corporation,* Officers and
    agents. *Equity Pleading and Practice,* Master: recommittal, confirma-
    tion of report.

In a suit in equity by a corporation engaged in the jewelry findings
    business to enjoin the defendants from utilizing in a rival business
    the information which they had acquired as former officers, directors
    or employees of the plaintiff relating to certain alleged secret processes
    used by the plaintiff, and for damages, where it appeared that the
    plaintiff's business was conducted with numerous employees working
    in sight of one another in a one story building without significant par-
    titions, that there was a considerable turnover in the labor force, that
    the plaintiff's policy was to guard its processes by not exciting undue
    interest therein, and that the plaintiff abstained from notifying or ad-
    monishing its employees with respect to secrecy and from making
    nondisclosure agreements with them, it was held that the plaintiff's
    processes were not trade secrets. [737–738]
There was error in a suit in equity in failing to recommit a master's re-
    port permeated with unsound conclusions as to alleged trade secrets
    and in confirming the report in that condition. [739]

Bill in equity filed in the Superior Court on May 12,
1964.

Contract or tort.    Writ in the Superior Court dated
March 18, 1964.

Replevin.    Writ in the Fourth District Court of Bristol
dated December 27, 1963.

Upon transfer of the replevin case to the Superior Court,
the cases were consolidated and were heard by a master-
auditor, and were reported by *Smith,* J.

*David E. Crosby* for the plaintiff.

*James K. Edwards,* of Rhode Island (*John J. Curtin, Jr.,*
with him) for the defendants.

[1] The companion cases are J. T. Healy & Son, Inc. *vs.* James A. Murphy,
executor, and J. T. Healy & Son, Inc. *vs.* James A. Murphy & Son, Inc.

WILKINS, C.J.   These three cases were consolidated and tried before a master, who was also an auditor, with findings of fact to be final.   A judge of the Superior Court denied the defendants' motion to recommit the master's report, confirmed it, and reported the cases on the pleadings, the master's report, and the judge's rulings of law, such decree to be entered as justice and equity may require.

I.  The first case is a suit in equity in the Superior Court, Bristol County, by J. T. Healy & Son, Inc. (Healy), against James A. Murphy & Son, Inc. (Murphy Co.); James A. Murphy, individually (Murphy);  James A. Murphy, as executor under the will of his late wife, Virginia;  John Soper, John Whalen [1], Vivian Carvalho, Carolyn Tousignant, and Dorothy Carey, former employees of Healy.

The bill sought (1) an injunction against the defendants disclosing or utilizing information about Healy and its processes, acquired by them as officers, directors or employees of Healy;  (2) an accounting from the individual defendants of sums received from Healy as compensation while planning to compete;  (3) an accounting of "damage" to Healy by the defendants;  (4) that all capital stock in Healy held by Virginia Murphy be reached and applied in satisfaction of the amount due Healy from her, and a constructive trust for the benefit of Healy to be imposed on capital stock held by Murphy as her executor;  and (5) a constructive trust for the benefit of Healy to be imposed on all Murphy Co. stock held by Murphy either individually or as executor of the estate of Virginia.

In general, this litigation concerns allegations that the defendants, former officers, directors or employees of Healy, acted wrongfully and in violation of their trust in taking records, dies, and secret information to set up a rival business.

The other two cases are actions at law.

II.  By J. T. Healy & Son, Inc. against James A. Murphy, executor under the will of Virginia, an action of contract or

---

[1] Subsequently deceased.   James A. Murphy, executor under the will of John Whalen, was substituted as party defendant.

tort for $49,000 wages and bonus received by Virginia Murphy in 1961, 1962, and 1963.

III. By J. T. Healy & Son, Inc. against James A. Murphy & Son, Inc., an action of replevin of certain dies and other items taken from the defendant.

Healy is a Massachusetts corporation, having a principal place of business in Attleboro, and was incorporated in 1948 with 3,000 shares of preferred and 1,000 shares of common stock. Mrs. Catherine L. Healy became the sole stockholder, transferring all the assets of the former J. T. Healy & Son, a sole proprietorship, of which she was owner. Like its predecessor, Healy engaged in the jewelry findings business. She had four living adult children, Marjorie (Wright), Elton, Virginia (Murphy), and Eugene, all of whom at one time or another took part in the Healy business.

When her husband died in 1935, Mrs. Healy was a housewife, but the course of events required her to take over the business, and she had to rely upon others to manage it, particularly upon her children. From 1948 to September 21, 1963, she was president, treasurer, and a director, and attended the meetings. Taking periodic trips to Florida, she remained the sole stockholder until about 1962. Then she gave 125 shares of common stock and 150 shares of preferred stock to each of three children, Elton, Marjorie, and Virginia, but none to Eugene. About 1958 Mrs. Healy bought a new home in Attleboro which was shared by Virginia and her husband. In 1962 she sold them the house, but remained a member of the household. She continued to do so after Virginia died on June 28, 1963. Over the years there had been many factions in the family and causes of dissension, much of which related to the business of Healy.

James A. Murphy, as far back as 1936, had worked part time for Healy on the machines. He left about 1940–1941. In 1953 he returned to do sales work. He was employed full time and eventually took charge of that work. In 1957 he took over cost work. In November, 1958, he was elected a director, secretary, and vice-president of Healy.

Murphy Co. was organized on May 29, 1963, as a Massachusetts corporation having a principal place of business in Attleboro. The directors were the two Murphys and a Providence lawyer.

Soper worked for Healy from 1929 to 1946 and from 1956 to September 20, 1963. In 1946 he went into another business making jewelry findings. Soper's training had been that of tool and die maker, and after 1957 he had charge of the Healy tool and die room. This was a very important function in the jewelry findings business in which a large number of dies had to be made and maintained, or replaced when they broke. It was highly skilled work and years of training were required to achieve the degree of skill necessary.

Jewelry findings are sold to jewelry manufacturers, who assemble the finished pieces of jewelry. The words "dies" and "tools" were used during the hearings more or less interchangeably as meaning about the same thing. A die is a piece of hardened steel which is used to give the desired shape to another piece of steel. At the Healy plant the material was always metallic, usually brass, but occasionally silver or gold. The manufacturing action consisted of stamping out the tubing to create the products which were to become jewelry findings, such as beads. Healy had two principal methods. One was by Langelier machine, an automatic device about two feet square of which Healy had five or six. The other was by foot press. The Langelier dies were numbered from 1 to 500, the foot press dies from 500 up.

The business of Healy was conducted in a one story building owned by Mrs. Healy and leased by her to the company. There were 5,500 square feet of floor space. In the front part of this space was a small office flanked by the shipping room. The remaining space was devoted to production. There was no significant partitioning. The employees worked in sight of each other. The toolroom was almost directly behind the office and was not enclosed. Bins, containing stock, which was usually in the form of tubing, formed one perimeter of the tool area and on another

perimeter of the tool area were racks for tools and dies containing spaces numbered in sequence. In other areas were the Langelier machines, lathes for patterning, foot presses, and other equipment.

Many dies owned by Healy had been made by Eugene, especially between 1952 and 1957. He initialed most of his. Still others had been made by various independent tool and die makers who did work outside the plant on a contract basis. Eugene was not employed to invent, but was employed to be general manager and devise profitable methods of manufacturing. He developed the processes of twisted-corrugated and the application of patterns on the Healy premises with its material and on its time, but there was no express agreement between him and Healy to assign his rights, nor did he do so.

Healy maintained its own tool and die room with its toolmaker and assistants for most of the necessary work. Dies could be made by a skilled toolmaker from a description given by the customer or they could be made from a sample of a product already made from another die.

The master made the following general findings.

(1) Neither Carey (typist and billing clerk), nor Tousignant (bookkeeper) nor Carvalho (expediter), nor Whalen (brother of Mrs. Healy) planned or schemed with each other, or with any other defendant to use confidential information of Healy for the benefit of Murphy Co.; nor did any one of the aforesaid defendants commit any breach of duty while an employee of Healy; nor did any one of the aforesaid defendants commit any act which would entitle Healy to any form of relief against anyone of them.

(2) Soper planned or schemed with the Murphys to use confidential information as to the dies of Healy for the benefit of Murphy Co., and their action in so doing was wrongful.

(3) Soper and the Murphys acted wrongfully in setting up for the benefit of Murphy Co. the processes of twisted-corrugated and application of patterns on tubing which were trade secrets of Healy.

(4) The process of applying patterns on tubing was a trade secret of Healy properly guarded as such, which Healy was entitled to protect by appropriate procedures.

(5) The process of twisted-corrugated was a trade secret of Healy properly guarded as such, which Healy was entitled to protect by appropriate procedures.

(6) The ball-end-mill method of making dies was not in and of itself a trade secret, but the dies, once completed, were a trade secret, at least as to their specifications.

(7) The record cards of Healy were trade secrets or confidential information, but were not misappropriated, nor copied, nor used in any manner by any defendant in breach of duty, and all information acquired by any defendant was acquired in the course of regular employment without breach of any duty and was used later at Murphy Co. only as remembered information.

(8) The same finding as (7) as to labor cards of Healy.

(9) The same finding as (7) as to customers list of Healy.

(10) The same finding as (7) as to the price list of Healy.

(11) The Murphys did not induce any employee of Healy, except Soper, to terminate employment prior to September 23, 1963. The Murphys induced Soper on or about June 1, 1963, to agree to work for them when they should establish their own business, but neither Soper nor any other defendant had any contract of employment with Healy.

(12) No defendant physically moved any cards or dies from the Healy plant except the dies concerned in the action of replevin.

(13) No defendant copied any record cards, shop information cards, customer lists, or price lists of Healy, but Soper used Healy dies wrongfully in violation of his duty as an employee.

(14) Murphy wrongfully used the dies made under Soper's direction from June 1 to September 23, 1963, to establish his business and also wrongfully used the process of twisted-corrugated and the application of pattern to tubing.

(15) Murphy bought tubing in the name of Healy and used its credit on two occasions, but the tubing was not

needed by Healy, there was ample available from suppliers, and the suppliers were paid by Murphy, and Healy's credit with the suppliers was not damaged.

(16) The property leased by Murphy Co. at 1879 County Street, Attleboro, was not necessary or desirable in the operation of Healy's business, and Murphy, while serving as director and officer, did not deny Healy any corporate opportunity in acquiring it, and in no other respect was any corporate opportunity denied to Healy by any defendant.

(17) The Murphys and Soper despite their breaches of duty while serving as employee (Soper) and as officers and directors (the Murphys) performed their duties for Healy well, and any time away from regular hours in preparing Murphy Co. to compete is insignificant and cannot be measured.

(18) Neither Murphy nor anyone acting on his behalf secured any order for Murphy Co. by representing that such order was being solicited on behalf of Healy or that Murphy Co. was a subsidiary of, or in any way affiliated with, Healy.

(19) The fair value of the time spent and materials used by Murphy Co. to replace tools and dies belonging to it which were taken by the sheriff on January 7, 1964, pursuant to Healy's writ of replevin is $325.

(20) No Healy customer was solicited by Murphy or anyone on behalf of Murphy Co. prior to September 23, 1963; no Healy customer was aware prior to that date that Murphy had planned or even contemplated going into business in competition with Healy.

The master made findings as to damages, he said, to enable the court to determine relief. In view of the judge's ruling, with which we agree, that "the measure [of damages] used by the master in computing damages under prayers 6 and 7 . . . was too speculative and conjectural properly to determine the issue," we omit statement of all such findings.

*As to prayer 6*, which asks that the individual defendants be ordered to account for all compensation received from Healy while they were engaged in the alleged conspiracy, the master stated, "I find that the Murphys and Soper were

engaged in a plan or scheme from June 1, 1963. I have found . . . that although they have breached their duty to Healy . . . in certain respects, they did their work well and I find that Healy . . . suffered no loss by reason of the time spent in their preparations to compete. Their preparations were done outside their customary hours at Healy."

*As to prayer 7*, which asks an accounting of any damages caused to Healy by the defendants, the master said it is a fair inference that all the sales of Murphy Co. were engendered by the twisted-corrugated process and pattern application.

*As to prayer 8*, the master stated that the matter of injunctive relief against using information about Healy processes is for the court.

*As to prayer 9*, the master stated that reaching Virginia's shares is likewise a matter for the court. As no debt has been found we hold that that stock cannot be reached or applied. The judge ruled that her stock, now held by James A. Murphy as executor, "is not subject to the constructive or resulting trust."

*As to prayer 10*, asking a constructive trust to be decreed of Virginia's shares, the master stated that relief may depend upon whether Healy was denied any corporate opportunities. The Murphy's action in acquiring the leasehold estate and in purchasing materials and supplies for the new corporation did not deny to Healy anything that it required. The judge's ruling that the stock of Virginia now held by James A. Murphy is not subject to a constructive or resulting trust is conclusive against granting this prayer.

In the law case of J. T. Healy & Son, Inc. *vs.* James A. Murphy, executor, the auditor found for the defendant on both counts. Virginia as officer and director rendered competent service.

The master stated that as auditor he had made no findings which would result in a general finding that the estate of Virginia owed the plaintiff for wages and bonuses received during 1961 and 1962. As to 1963, although he found that there was a plan or scheme from June 1, he nevertheless

found that her services to Healy were rendered well and competently, and Healy is not entitled to recover on any theory. He found for the defendant executor on each count.

The principal issue in the equity case is that of trade secrets. "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. . . . A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article. . . . The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret." Restatement: Torts, § 757, comment b.

The master found that the ball-end-mill method so called was not a trade secret, but that the dies made by this method were. He also found that processes known as the pattern application and twisted-corrugated methods were trade secrets, but his findings are quite indefinite as to what aspects or features he was finding to be trade secrets. The master's findings that the record cards, price cards, and customers list were trade secrets or confidential information are rendered unimportant by general findings 7 to 10 that they were not misappropriated, copied, or used by any defendant in breach of duty.

The patterning and twisted-corrugated processes were carried out in Healy's small-sized shop in conjunction with the rest of the operation. In 1963 there were twenty-eight employees. There were no partitions.

There was no written notice to employees nor admonishment against discussing the processes when they should be outside the plant. No employee was required to sign a nondisclosure agreement. This was company policy based

on the theory that the best way to guard the secret was not to excite undue interest. The same policy of abstention from making nondisclosure agreements and from admonishment of employees was followed under various managers: Eugene 1954–1957, the Murphys 1957–1963, Eugene October, 1963, to April, 1964, and Elton October, 1964, and thereafter except that in 1964 Elton began requiring sales agents to sign nondisclosure agreements. Although some departmental foremen had been at Healy's for many years, there was a considerable turnover in the labor force, a fact which is characteristic of the jewelry industry. The public was not admitted. The master was not satisfied that anyone other than employees and officers went into the plant except Healy's New York salesman, who was, of course, an employee.

Those employees who were engaged in other work, namely, on the foot presses or the Langelier machines, could see the two secret processes. It is not conclusive that the master tried to limit his decision by finding that there was no evidence that merely seeing them would give any observer in such a position a reasonable opportunity to understand how a process was done, or that close scrutiny would be required to appreciate it. The master also was not satisfied that the production employees were specifically warned by Eugene that these processes were trade secrets or that when Eugene left in 1957 he told his mother and the Murphys in so many words that he regarded the processes as secret.

The essential characteristic of a trade secret being secrecy, we cannot reconcile the findings that certain processes were trade secrets with some of the other findings which prove that they were not guarded at all. The purported conclusion that the two processes "were sufficiently guarded by means that were reasonable in all the circumstances" is unacceptable when it has to be considered along with the testimony and the finding that there was a company policy that the best way to guard a secret was not to excite undue interest. This we construe to be a consciously adopted plan to do nothing affirmative to admit that anything was

secret. It not only is suggestive that the whole idea is an afterthought but is completely at variance with the rule that individuals must be constantly admonished that a process is secret and must be kept so. We regard nonaction pursuant to the so called policy as an insuperable reason why these processes cannot be trade secrets. This result is especially appropriate where the manufacturing area is small and there are numerous employees in sight of one another engaged in a type of business where the turnover is considerable.

A trade secret need not be a patentable invention. "The fact that an invention is patentable does not compel the taking out of a patent, nor prevent the person entitled to it from keeping it secret." *Wireless Specialty Apparatus Co.* v. *Mica Condenser Co. Ltd.* 239 Mass. 158, 165. But if the person entitled to a trade secret wishes to have its exclusive use in his own business, he must not fail to take all proper and reasonable steps to keep it secret. He cannot lie back and do nothing to preserve its essential secret quality, particularly when the subject matter of the process becomes known to a number of individuals involved in its use or is observed in the course of manufacture within plain view of others. "[O]ne may not venture on liberties with his own secret, may not lightly or voluntarily hazard its leakage or escape, and at the same time hold others to be completely obligated to observe it." *Gallowhur Chem. Corp.* v. *Schwerdle,* 37 N. J. Super. 385, 397. As a nationally known member of the patent bar has written,[1] one who claims that he has a trade secret must exercise eternal vigilance. This calls for constant warnings to all persons to whom the trade secret has become known and obtaining from each an agreement, preferably in writing, acknowledging its secrecy and promising to respect it. To exclude the public from the manufacturing area is not enough. "[T]he secret. is out . . . where machines or practices are more or less openly used in the plaintiff's factory, not restricted to the

---

[1] Frederick P. Fish, Esq., of the Boston bar in 29 Proceedings, Am. Soc· Mechanical Engrs. 13 (1907).

activities of confidential employees, and are secret 'only to the extent that many manufacturers are accustomed to exclude the general public from an inspection of their methods.'" 2 Callmann, Unfair Competition, Trademarks and Monopolies, § 53.3, p. 392. See *Peerless Roll Leaf Co., Inc.* v. *Lange,* 20 F. 2d 801, 801–802 (3d Cir.), where it was said, "[W]e find no more secrecy in the plaintiff's business than that which normally exists in the average manufacturing business. Practically all are secret in the sense that the public is, for many obvious reasons, excluded from manufacturing plants."

General findings 4, 5, and 6, are to be struck from the report. General findings 2, 3, and 7 to 10, inclusive, are to be modified by striking out all statements which purport to treat any operations, processes, or dies of Healy as trade secrets or confidential.

There was error in the failure to recommit the master's report, permeated as it was with unsound conclusions as to trade secrets. It also was error to confirm the report in that condition. A judge should not confirm a master's report unless it affords a fair and adequate basis for a decree on the merits. *Minot* v. *Minot,* 319 Mass. 253, 257. The report also should be in a form suitable for appellate consideration.

Our disposition of the master's conclusions as to trade secrets has the advantage of eliminating any need to summarize more of the diffuse master's report on that subject. It also renders immaterial any discussion of certain other rulings presented on the record. Among these are the failure or refusal to report additional facts, questions respecting summaries under Rule 90 of the Superior Court (1954); failure to find truth of statements in affidavit; the degree of proof required; and the contentions that the plaintiff had only a shop right in the subject matter of the alleged trade secrets.

As required by the first general finding, the bill of complaint is to be dismissed against the defendants Carey, Tousignant, Carvalho, and James A. Murphy, as executor

under the will of Whalen. More specifically, it was found that no defendant took from Healy any record cards, price cards, or customer lists.

None of the defendant employees, including Soper, had contracts of employment with Healy. They had a right to use their general knowledge, experience, memory, and skill. *Wireless Specialty Apparatus Co.* v. *Mica Condenser Co. Ltd.* 239 Mass. 158, 165. Unlike the employees in the *Wireless* case, there were no trade secrets by which they could be bound. They could use remembered information which it was found some defendants did. See *Padover* v. *Axelson*, 268 Mass. 148, 151; *DiAngeles* v. *Scauzillo*, 287 Mass. 291, 298–299; Restatement 2d: Agency, § 396.

That Murphy was a director did not make information, otherwise properly acquired, confidential. *American Window Cleaning Co. of Springfield, Mass.* v. *Cohen*, 343 Mass. 195, 201. A director is not necessarily barred from competing. *Lincoln Stores, Inc.* v. *Grant*, 309 Mass. 417, 423.

So far as the defendants Murphy and Soper are concerned, there are no definite findings remaining in the master's report upon which damages could be based, even if we were of opinion that there was liability, a fact which we do not decide.

The interlocutory decree in the suit in equity confirming the master's report as modified in accordance with this opinion is affirmed. The suit is to stand for such further proceedings as may be necessary in accordance with this opinion. There are to be no costs.

In accordance with the auditor's report in which there was a finding for the defendant on both counts, there is to be a judgment for the defendant in the law action by J. T. Healy & Son, Inc. against James A. Murphy, executor.

In accordance with the nineteenth general finding there is to be judgment for the defendant for $325 in the replevin action.

*So ordered.*